IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 3, 2023

**STATE OF TENNESSEE v. GIORGIO JENNINGS**

**Appeal from the Criminal Court for Shelby County**
**No. 18-00842         Chris Craft, Judge**

_____

**No. W2022-01533-CCA-R3-CD**

_____

The Appellant, Giorgio Jennings, was convicted by a Shelby County jury of six counts of aggravated rape, five counts of aggravated robbery, three counts of aggravated assault, three counts of facilitation of aggravated assault, three counts of aggravated kidnapping, aggravated burglary, and employing a firearm during the commission of a dangerous felony. The trial court sentenced the Appellant to an effective sentence of one hundred and thirty-two years in confinement. In this appeal, he challenges: (1) the sufficiency of the evidence supporting his convictions; and (2) the trial court's imposition of partial consecutive sentences. After review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Phyllis Aluko, District Public Defender, and Barry W. Kuhn (on appeal), Assistant District Public Defender, and Charles Waldman, Memphis, Tennessee (at trial) for the Appellant, Giorgio Jennings.

Jonathan Skrmetti, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Abby Wallace, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On January 17, 2011, five friends were gathered at 4388 Owen Road in Memphis, Tennessee, when three masked men with guns entered the home looking for drugs and money. There was one tall man, and two shorter men. Based on the State's theory, the Appellant was the tall man. The tall man and one of the shorter men took the two women,

L.R. and M.J.,[1] to the bedrooms and raped them.  A third woman, S.H., arrived during the home invasion, and the tall man and one of the shorter men also raped her.  Meanwhile, the third masked man remained in the living room with the male victims, K.S., S.R., and M.G.[2]  He shot two of them in the hand and hit the other with a pistol when they denied having drugs in the home.  The masked men ransacked the home and the victims' pockets, taking numerous items.

One of the items taken, an Xbox, was linked to the Appellant shortly after the home invasion.  The Appellant admitted involvement to the police, but claimed he was the driver.  Three years later, testing confirmed that sperm found on a papasan chair, where one of the women was raped, belonged to the Appellant.  Another three years passed before the Appellant was located in another state using an alias, and he was apprehended.  A Shelby County grand jury indicted the Appellant on twenty-three counts—six counts of aggravated rape, six counts of aggravated robbery, six counts of aggravated assault, three counts of aggravated kidnapping, aggravated burglary, and employing a firearm during the commission of a dangerous felony.

**Trial**.  The Appellant's five day trial began on November 8, 2021.  The proof relevant to the issues raised in this appeal is summarized below.

**L.R.**  L.R. testified that in January 2011, she was living at 4388 Owen Road with her then-fiancé K.S.  The front door of the home opened into the living room.  In the living room, there was a couch, oversized chair, television, PlayStation, and Xbox.  The couch was against the back wall, under a window looking into the kitchen.  The home also contained two bedrooms, one of which they used as a game room.  The game room contained a television and a papasan chair.

On January 17, 2011, L.R. and K.S. invited friends over to eat dinner and watch Jersey Shore.  Around 8:00 p.m., L.R. was in the living room with M.J. and M.G., while K.S. and S.R. were in the kitchen preparing their dinners.  Suddenly, three black men with hoods on their heads and bandanas covering their faces kicked in the front door.  The three men were each holding a gun and told everyone to get on the ground.  One of the men jumped onto the couch, held his gun through the window looking into the kitchen, and told K.S. and S.R. to come into the living room and get on the ground.  One of the guns was a black Uzi and one was a black and brown revolver.  She could not remember what the third gun looked like.  One of the men "was tall and kind of [skinnier]" and wore blue plaid pajama pants.  The other two men were shorter and wore jeans.

---

[1] It is the policy of this court to identify victims of sexual offenses by their initials only.
[2] It is the policy of this court to identify family members of victims of sexual offenses by their initials only.

L.R. said that after everyone got on the ground, the men made her and M.J. remove their clothes. They searched everyone, taking their phones. They did not take L.R.'s phone because, when the men initially entered, L.R. had called 911 and had hidden her phone. When they made her remove her clothes, she called 911 again and threw her phone under the couch. The men asked if anyone had a gun, and M.G. told them he had one in his waistband. The men took M.G.'s gun and "hit him upside the back of the head[.]"

One of the shorter men then took L.R. to the game room. He asked her to perform oral sex on him and she told him that she had HIV, which was not true, "just to try to get him to leave [her] alone." The man took her back to the living room. When she returned to the living room, she saw that M.G. and K.S. had both been shot in the hand. At some point, S.H. arrived at the home, opened the door, and took off running. The men brought her back inside and made her remove her clothes.

Next, L.R. said the tall man in the pajama pants hit her on the buttocks and took her to the bedroom. In the bedroom, he said he had been told they had "dope" and kept asking her where it was. She told him they had real jobs and did not sell "dope." He made her get on her knees, and he inserted his penis into her mouth. He held a gun to her forehead and threatened to "blow [her] brains out" if she bit down." He made her bend over the bed and inserted his penis into her vagina. She told him that he was hurting her, and he said he did not care. He used a condom when he penetrated her vagina, but not when he penetrated her mouth. She did not know whether he ejaculated.

When L.R. returned to the living room, the men were still searching for drugs. They had flipped over her furniture and ripped into its fabric. At some point, one of the shorter men took L.R. back to the bedroom. She was unsure if he was the same man who took her to the game room initially. The shorter man said he wanted a second girl, so another man brought M.J. to the bedroom. He said he wanted the other one, so the man brought him S.H. instead. He put a condom on, held a gun to their heads, and inserted his penis into their mouths. L.R. was unsure if he ejaculated. He made them stop because L.R. started gagging and S.H. was "crying so bad[.]" He took them back to the living room.

L.R. said one of the shorter men was in the living room at all times, armed with a gun, with K.S., M.G., and S.R. He seemed to be the leader. When the men were walking out, they saw L.R.'s puppy in a cage and took her. She begged them not to take the puppy and one of the men said, "bitch, I'll take whatever I want[.]" The men took her television, jewelry, laptop, and puppy. They also took the PlayStation, Xbox, Wii, swords, phones, and wallets. L.R. only saw three men, but it was possible that a fourth man came in at some point. She thought that there was a fourth person outside because a horn honked and the leader said "that's our [c]ue." When the men left, they told L.R. and her friends to

"count to [one hundred] and don't come out." When they shut the door, L.R. jumped up and locked it. A few minutes later, L.R. and her friends ran to the neighbor's house and had them call 911.

On cross-examination, L.R. said that the tall man was "over six feet" tall. She agreed, however, that she had previously testified that he was six feet, five inches tall. She acknowledged that the men stole "a little sack" of marijuana from the home. She also discussed the incident that she believed led to the home invasion. The day before, M.G.'s friend "Heath" came over while she was gone and "supposedly sold some [marijuana] to some people" outside of her home.

**K.S.** K.S. testified that he heard a loud bang while in the kitchen with S.R. He looked through the window into the living room and saw three masked men, each holding a gun. The men were black and wore bandanas and hooded sweatshirts. Two of the men were "medium height" and one of them was "kind of tall." One of the men immediately jumped over the couch and put his gun through the window and into K.S.'s face. He ordered K.S. and S.R. to get down. They complied, and the masked men started screaming, "Where is the [k]ush? We know it's here." K.S. tried to tell them they had the wrong house.

K.S. said after twenty to twenty-five minutes, the men made L.R. and M.J. remove their clothes. Shortly after, S.H. arrived to see if M.G. was at the home. A fourth man outside saw S.H., held a gun to her, and pushed her into the home. The men made her remove her clothes. Two of the men took L.R. and M.J. to the bedroom and game room. Shortly after, they took S.H. to the room where L.R. was. The third man stayed in the living room with K.S., S.R., and M.G. the entire time "making sure [they] didn't go [anywhere]." He walked up and down the hall toward the bedroom and game room, saying things like "y'all are raping these bitches. We're gonna have to kill these folks."

K.S. stated that after M.G. continued to deny that there were drugs in the home, the man in the living room asked him which hand he rolled marijuana with. M.G. responded his left, and the man shot him in his right hand. The man then turned his attention to K.S. K.S. told the man it was his house but insisted that he did not sell drugs. The man told him to stick his hand out and shot him in the hand. Then, the man "stuck the gun up [K.S.'s] ass" and threatened to shoot him if he did not tell him where the drugs were. K.S. continued to tell him there were no drugs. The man's gun looked like a small automatic. The other men had a revolver and "maybe a nine." Each of the men, at different times, were screaming "Rob, rape, murder is what we do." One of the men appeared to be the leader, but K.S. was not sure how tall he was.

- 4 -

K.S. said the men then brought the women back into the living room. One of the men picked up K.S.'s puppy. He held a gun to the puppy's head and threatened to shoot her if K.S. did not tell him where the drugs were. He began counting down. When he got to one, he said the puppy was too pretty and took her with him instead. The men also took cell phones, wallets, cash, jewelry, the television, an Xbox, a PlayStation, and K.S.'s medieval swords and knifes. After all the items had been removed from the home, the men were talking to each other saying, "let's get ready to line them up in the back. We're gonna have to kill these folks." They heard a car horn and one of the men said "that's the code." The men ordered everyone to stay on the ground and left. K.S. only recalled seeing three men, but he knew they had a driver because all three men were in the home when he heard the car horn. Once the men were gone, K.S., S.R., and M.G. ran to the neighbor's house to call the police.

K.S. then described the drug sale that occurred at his home the day before the home invasion. M.G., S.R., L.R., and Michael Heath Grant, whom they called Heath, were at K.S.'s home watching football. Someone knocked on the door, and Heath[3] said it was for him. Without K.S.'s knowledge, Heath had arranged for someone named "Jac" to come buy marijuana from him. Heath had never sold drugs from K.S.'s home before. Jac bought the marijuana, but came back ten minutes later and said he wanted his money back because his friend did not want the marijuana. Heath weighed the marijuana, and there were three grams missing. At one point, K.S. thought Jac may have orchestrated the burglary.

**M.J.** M.J. testified that she and her then-boyfriend S.R. went to L.R.'s home to have dinner and watch television. While she and L.R. were sitting on the couch in the living room, two to three men "ran through the door and started ransacking the house." The men were each at least five feet, nine inches tall, and one looked taller—six feet, one or two inches tall. Each of the men had a gun and told everyone to get on the ground. Two of the guns were "plain black guns" and one looked like a revolver. One of the men jumped through the window looking into the kitchen and told M.G., S.R., and K.S. to come in the living room. Everyone got on the ground, and the men started asking where the drugs and money were. They told L.R. and M.J. to remove their clothes. The men ransacked the home and went through the women's purses.

One of the men took M.J. to the bedroom and shut and locked the door. He held a gun to her head and made her perform oral sex on him. Then, he told her to stand up, turn around, and bend over. He inserted his penis into her vagina while holding the gun to the back of her head. He used a condom the entire time. She did not know what the man

---

[3] Because Malik Grant and Michael Heath Grant share the same last name, we will refer to them by their first and second names respectively throughout this opinion. We intend no disrespect in doing so.

looked like because she could only see his eyes. The men were all wearing dark colored clothing, long pants, and long shirts or hooded sweatshirts.

M.J. said when she returned to the living room, the men were again asking where the drugs and money were. They picked up L.R.'s puppy and threatened to kill her. Then, they took L.R. and S.H. to the game room. When L.R. and S.H. returned to the living room, another man grabbed M.J., took her to the game room, and shut and locked the door. The man was taller and thinner than the first man that raped her. The man forced her to perform oral sex on him. He then inserted his penis into her vagina while she was lying on her back on the papasan chair. He held her down with one hand and pointed the gun at her with the other. He used a condom both times.

When M.J. returned to the living room again, the men were still looking for drugs. She saw one of the men using cocaine in the kitchen. At one point, she heard two gunshots. She later saw that K.S. had been shot in his hand and was bleeding. The men took M.J.'s cash, wallet, and phone. They also took an Xbox, PlayStation, and the puppy. M.J. heard a horn honk and one of the men said they needed to go. They tried to tie everyone up with electrical cords, but were unsuccessful. They carried the television outside to the car, and one of the men "poked their head back in and said don't move." After a few minutes, M.J. and her friends went across the street and called police. On cross-examination, M.J. said she did see one of the men bring S.H. into the home.

**S.R.** S.R. testified that he was in the kitchen with K.S. when the door swung open and three masked men entered the home holding guns. The men were wearing hooded sweatshirts, pants, and bandanas. A taller man wearing a gray hooded sweatshirt came through the window into the kitchen and pointed a gun at him. The gun looked like a Glock with an extended clip. The men were asking where was the money. The men patted everyone down and took S.R.'s wallet, cell phone, and some marijuana from his pockets.

S.R. said that one of the men appeared to be in control of the situation. He was shorter, between five feet, nine inches and six feet tall. He kept calling the other men his boys, calling out times, and telling them what to do. The men kept asking where the "dope" and money were. One of the men asked K.S. with which hand he rolled marijuana, and he responded his left. The man then shot K.S. in his right hand. When M.G. denied knowing where the drugs and money were, the man asked him the same question and shot him in his hand. S.R. was "almost [] certain" that the man who appeared to be in control was the one who shot K.S. and M.G. S.R. was also hit with a pistol six times in the back of the head.

S.R. said the men then ordered the women to remove their clothes. One of the men took one woman to the bedroom and another man took the other woman to the game room.

One man stayed in the living room the entire time to make sure that S.R., K.S., and M.G. did not get up. The man in the living room jokingly asked the others, "y'all back there raping them?" S.R. did not remember hearing the other two men speak, but he heard them sniffing drugs. At some point, S.H. walked in and saw everyone on the floor. She took off running, and one of the men went out to get her and brought her back in.

S.R. said the men took a television, PlayStation, Wii, Xbox, puppy, and collectible weapons. After a car horn honked, someone took the television outside. The men apparently did not locate the drugs they were looking for. The main perpetrator said, "[W]e always get the wrong information. It's always the wrong house." The men told them to count to one hundred and left. One of the men "popped his head back in the door" and jokingly said, "y'all gone have to relocate." Shortly after, they all went to the neighbor's house to try to get help.

S.R. described the information he provided police to assist with the investigation. The stolen Xbox was S.R.'s, which he had left at K.S.'s home the day before the home invasion. Shortly after the home invasion, one of S.R.'s friends told him the Xbox "went live online." S.R. checked his Microsoft account, and someone had changed the name to "Malikgrantdogazz." He searched the name on Facebook and found an account with the same name. The profile was private, so S.R. made a fake Facebook page, added all of the person's friends, and then added the person. The person made a post on January 18, 2011, asking for people to play games online with him. Two people commented their account names, and those names matched the new friends that had been added to S.R.'s Microsoft account.

S.R. also described the drug sale at K.S.'s home the day before the home invasion. S.R. was at the home with a group of people, including a man named Heath. While they were there, Heath got a phone call from a man named Jac asking for marijuana. Jac came to the home, and Heath went outside and sold him marijuana. Shortly after, Jac entered the home complaining that "the bag was light." Heath weighed the bag and said the man "pitched out of [his] bag" because it was now "short." S.R. did not see or know about any other drug transactions happening at K.S.'s home.

**M.G.** M.G. testified that on January 17, 2011, he went to K.S.'s home and his then-girlfriend S.H. was planning to meet him there later. He was sitting in the living room when three men came through the front door holding guns. Two of the men had "semiautomatics with long clips" and one had a revolver. One of the men was taller, maybe six feet, three inches tall, and was wearing pajama pants. The shorter men were wearing jeans. The men had shirts tied covering their faces. The men said, "[Y]ou know what this is. Get on the ground." The men made K.S. and S.R., who were in the kitchen, come in

the living room.  Thirty seconds after the men entered, S.H. arrived.  One of the men brought her inside.

M.G. said the men were asking where the drugs were.  They beat M.G. in the head with the gun and put the gun "in [his] butt area" to try to get information from him.  The shorter man, who appeared to be in charge, asked M.G. with which hand he rolled marijuana, and M.G. responded his left.  The man then shot him in his right hand.  Next, the man shot K.S.  All three of the men were in the living room when M.G. and K.S. were shot.  M.G. testified that at some point, the men made all of them take off their clothes.  The men took a nine-millimeter Hi-Point pistol that M.G. had in his shorts.

M.G. stayed on the ground in the living room the entire time the men were in the home.  Two of the men took the women to the bedrooms, while the leader stayed in the living room with M.G., K.S., and S.R.  When the other two men returned to the living room, they started taking things and flipping over furniture.  They took the television, swords, M.G.'s wallet, and two grams of marijuana.  After they had taken the property, they said, "so, y'all mean to tell us we got the wrong house?"  Throughout the night, the leader was communicating with someone on the outside letting them know when to come back.  M.G. heard a car backing up to the front porch, and the men left five minutes later.  A couple of seconds after they left, they "ducked back in to make sure nobody moved."  M.G. and the others then went to the neighbor's house to get help.

M.G. testified about the drug sale at K.S.'s home the day before the home invasion.  He was at K.S.'s home with K.S., S.R., and his friend Heath.  A man came to the home to buy marijuana from Heath.  M.G. was not sure what happened, but the man did not get the marijuana.  He had not seen any other drug transactions at K.S.'s home.

**S.H.**  S.H. testified that she went to L.R.'s home when she got off work.  She opened the front door and saw a man in a hooded sweatshirt with a silver revolver.  She shut the door and turned to run down the steps.  The man came outside, put a gun to the back of her head, and told her to come inside.  She threw her wallet across the driveway and put her phone in her shirt.  When she entered the living room, there were two more men, both with guns.  Of the three men, one was "distinguishably taller than the other two."  One of the shorter men was the one that brought her in the home.  The shortest man seemed "a little older" than the others and appeared to be in charge.  The men told her to remove her clothes, but she just removed her jacket and got on the ground.  She slid her phone under the ottoman, but she could not get it unlocked.  The men were asking for marijuana.

One of the men told S.H. to remove the rest of her clothes.  She complied because he had a gun.  The men patted M.G. down and took his gun.  She heard a gunshot close to her head.  One of the men then took her to the game room.  The taller man was in the game

room with his penis exposed. He had a gun, but told her he was not going to hurt her. He made her perform oral sex on him. The man then made her stand up and turn around. He inserted his penis into her vagina. He was not wearing a condom initially, but at some point, another man opened the door and gave him a condom.

S.H. said after she returned to the living room, one of the men took her to the bedroom. The man with gray plaid pajama pants was in the bedroom already with L.R. and M.J. Someone took M.J. out of the room. The man in the pajama pants had a gun and told S.H. and L.R. that they needed to perform oral sex on him together. He inserted his penis into both of their mouths. They were both crying. He stopped, and they went back into the living room. The men took everyone's phones, a gaming system, and a television. The men were in constant communication with their driver through a cell phone, giving the driver time estimates. Before they left, they loosely tied S.H. and M.J. with an extension cord.

Officer Arica Hutchison testified that on January 17, 2011, she was notified of multiple 911 calls coming from cell towers near Owen Road. She was driving around the area to see if she could identify the address the calls were coming from. Thirty to forty-five minutes after the initial calls, another 911 call identified a home invasion at 4388 Owens Road. Officer Hutchison responded to the scene.

Michael Heath Grant, who many people called Heath, testified that he was friends with M.G. and was at K.S.'s home on January 16, 2011. Heath had marijuana, and "an associate" of his who he knew as Jac and Jac's cousin came over to buy some. They ultimately did not want the marijuana and gave it back. When Heath spoke to police, he identified Jac as Jac Kones,[4] who is now deceased. Heath acknowledged having recently pled guilty to theft.

Officer Wilton Cleveland testified that based on information from one of the victims, he learned the IP address that the stolen Xbox was using. Officer Cleveland searched the house connected to the IP address and did not find the stolen Xbox. He discovered, however, that the house's router was open, meaning anyone within a certain range could connect to it. Several months later, he learned the person using the Xbox changed the username to "Malikgrantdogazz." He discovered a Facebook account with the same username belonging to Malik Grant. They located and interviewed Malik. Malik lived two houses down from the open router with his mother and two brothers—one of whom was the Appellant. The mother consented to a search of the home. During the

---

[4] Although Heath initially refers to this individual as Jac Konak (spelled phonetically), Heath confirms on cross-examination that his name is Jac Kones. We will refer to him as Kones to avoid any confusion.

search, Officer Cleveland found the collectible swords and PlayStation 3 that had been stolen. The swords were under the Appellant's bed. Though the Xbox was not in the home, Microsoft records showed that the first time the Xbox was used at the new IP address was on January 18, 2011 at 4:37 a.m., hours after the home invasion.

Malik Grant, who was fourteen years old when he spoke to the police in April 2011, testified and denied remembering the contents of his statement. He acknowledged, however, that the following facts appeared in his statement. The Appellant had a key to the house police searched and sometimes stayed there. The Appellant brought the Xbox to the house in the middle of January 2011. Malik connected it to Wi-Fi and played Xbox online. The Appellant also brought a PlayStation 3 to the house. The Appellant told Malik that he bought the gaming systems off the street from a "crack head." Malik acknowledged that he was serving eight years' probation for attempted second degree murder.

Eric Gilliam, formerly a sergeant at the Memphis Police Department, testified that he was the lead investigator of this case. After receiving information from the victims, he interviewed Heath about the drug sale that occurred the day before the home invasion. He then interviewed Jacques Kones and collected his DNA. Sergeant Gilliam was unable to connect Kones to the home invasion.

Sergeant Gilliam said he interviewed and took a DNA sample from the Appellant on April 5, 2011. The Appellant's statement was entered into evidence. In the Appellant's statement, he admitted to bringing the Xbox, PlayStation 3, and swords to his mother's house at the end of January 2011. He said he got them from a man named "Shawn[,]" also known as "PV," who got them from a home invasion. Shawn offered to pay him if he drove Shawn to the home. He drove Shawn and two other men to the home and waited in the car. At some point, he went inside to tell the men "they [needed] to be ready to roll" because the police had driven by. While he was inside, he saw men and women lying on the floor. The women were nude. Ten or fifteen minutes after he returned to the car, Shawn loaded a television and two bags into the car and went back into the house. They also took a Hi-Point nine millimeter gun and a puppy. The Appellant got tired of waiting and blew the car horn. The men came running out. As he drove away, Shawn told him he shot two of the males in the hand because they did not "come up with [any] money or [] [marijuana]." Shawn also told him that he "got some head" from one of the girls.

In the Appellant's statement, the Appellant described Shawn as five feet, ten inches tall. He said one of the other men involved was named "D", and was six feet, one inch tall. He did not know the third man's name, but he was the same size as Shawn. The Appellant is six feet, one inch tall. Shawn had a revolver, but he did not see the other two men with a weapon. Sergeant Gilliam testified that he located Gabriel Deshaun Humphrey, who the Appellant confirmed was the Shawn he was referring to. Humphrey was in prison in

Mason, Tennessee. He obtained a DNA sample from Humphrey, but was unable to connect him to the home invasion.

Lieutenant Roosevelt Twilley testified that he conducted a second interview of the Appellant on April 8, 2014, after DNA testing confirmed the Appellant's semen was on the papasan chair at the crime scene. The Appellant's statement was entered into evidence. This time, the Appellant admitted to entering the "back room," where one of the other men was receiving oral sex. The man persuaded the Appellant to "come and get some." The blonde woman performed oral sex on the Appellant, but he got nervous and left. He did not wear a condom. He claimed that he partially ejaculated and was not sure where the semen went. On June 10, 2014, Lt. Twilley requested an arrest warrant for the Appellant. He attempted to locate the Appellant numerous times but was unsuccessful. On May 9, 2017, he was notified that the Appellant was seen in Las Vegas, Nevada, using an alias. At some point, the Appellant was apprehended.

Agent Donna Nelson, the lab director for the Tennessee Bureau of Investigation Crime Lab, testified that she analyzed the rape kits of L.R., M.J, and S.H. and items recovered from the crime scene. She was provided with saliva standards from the Appellant, Kones, and Humphrey for comparison. Sperm found on the papasan chair was consistent with the Appellant's DNA. Sperm belonging to an unknown male was found in M.J.'s underwear. Agent Nelson confirmed that the sperm in M.J.'s underwear did not belong to Humphrey, but she did not compare it to the Appellant's DNA profile or Kones' DNA profile. Sperm belonging to a second and different unknown male was found on a pillow case and sheet. Agent Nelson confirmed that the sperm on the pillow case and sheet did not belong to the Appellant, Kones, or Humphrey.

The State rested, and the defense did not present proof. The jury found the Appellant not guilty of the aggravated robbery of S.H. The jury also found the Appellant not guilty of the aggravated assaults of M.G., K.S., and S.R., but guilty of the lesser included offenses of facilitation of aggravated assault. The jury convicted the Appellant as charged for the remaining nineteen offenses.

**Sentencing Hearing**. The trial court conducted a sentencing hearing and imposed an effective sentence of one hundred and thirty-two years.[5] For the aggravated rapes, Class A felonies, and the aggravated robberies and aggravated kidnappings, Class B felonies, the trial court found that the Appellant was a Range I offender. For the remaining offenses, Class C felonies and below, the court found that the Appellant was a Range II offender. The court imposed the following sentences: twenty years for each of the six aggravated

---

[5] The sentencing hearing transcript in the record contains only the trial court's discussion and ruling. Based on the transcript, it appears that evidence was presented at an earlier hearing.

- 11 -

rapes, ten years for each of the five aggravated robberies, eight years for each of the three aggravated assaults, six years for each of the three facilitations of aggravated assault, ten years for each of the three aggravated kidnappings, six years for aggravated burglary, and six years for employing a firearm during the commission of a dangerous felony. Because the aggravated burglary was the dangerous felony underlying the firearm conviction, the court ordered those sentences to run consecutively. See Tenn. Code Ann. § 39-17-1324(e)(1).

The court ordered that the six aggravated rape sentences be served consecutively. The court ordered that the remaining sentences be served concurrently with one another, but consecutive to the aggravated rapes, for an effective sentence one hundred and thirty-two years. The court imposed partial consecutive sentences based on the dangerous offender classification, stating:

> This was . . . other than when someone was killed by torture or dismemberment, which I've had unfortunately, this is the most horrible crime that I've ever had to try. So, in looking at the sentencing factors, the consecutive factors, I find that with no hesitation the [Appellant] is a dangerous offender, his behavior indicates . . . no regard for human life, [and] no hesitation about committing a crime in which the risk to human life is high. And under the Wilkerson factors, I find all three.

The court noted that the circumstances of the offense were "extremely horrifying and aggravating" and that if he were a victim in this case, he "would have nightmares about this for the rest of [his] life." The court found that the sentence was "necessary to protect society from the [Appellant's] unwillingness to lead a productive life." The court noted that the Appellant was too dangerous because he "basically enslaved and tortured people for a long time." After an unsuccessful motion for new trial, the Appellant filed an untimely notice of appeal, which this court accepted as timely filed in the interest of justice.

## ANALYSIS

**I. Sufficiency of the Evidence**. The Appellant first challenges the sufficiency of the evidence supporting each of his twenty-two convictions. The State responds, and we agree, that the evidence is sufficient to support the convictions.

When evaluating the sufficiency of the evidence, this court must determine "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Because a guilty verdict removes the presumption of innocence and imposes a presumption of guilt, the Appellant bears the

burden of showing why the evidence is insufficient to support the verdict. Id. (citing State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

In addition to the statutory elements, "[t]he identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. State v. Thomas, 158 S.W.3d 361, 387 (Tenn. 2005). The identification of the defendant as the perpetrator is a question for the trier of fact after considering all the relevant proof. Id. at 388. The State can prove identity by establishing that the defendant's own conduct, or the conduct of a person for which the defendant is criminally responsible, constituted the offense. Tenn. Code Ann. § 39-11-402.

Criminal responsibility is "'not a separate, distinct crime'" but "'a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.'" State v. Davidson, 509 S.W.3d 156, 214 (Tenn. 2016) (quoting State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). An individual is criminally responsible for the conduct another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a).

Under the doctrine of criminal responsibility, a person is liable not only for the target offense, but also for offenses committed that were the natural and probable consequences of the target offense. State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000) (citing State v. Carson, 950 S.W.2d 951, 954-55 (Tenn. 1997)). Whether an offense was a natural and probable consequence of the target offense is a determination for the jury as the finder of fact. Id. The natural and probable consequences doctrine is "based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably[,] and foreseeably put into motion." Id. Under this doctrine, the State must prove the following beyond a reasonable doubt: "(1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." Id.

- 13 -

**A. <u>Aggravated Rape</u>**.  The Appellant does not challenge the proof showing that six aggravated rapes occurred.  Instead, he challenges the proof of his identity as the perpetrator.  He contends that none of the three victims identified him, and the sperm and DNA recovered from the rape kits could not be traced to him.  He also contends that he is not criminally responsible for the aggravated rapes because he did not intend to assist in their commission.  He only intended to assist in theft, of which aggravated rape is not a natural and probable consequence.

Because the three men that participated in the home invasion had their faces covered, the victims instead distinguished between the men based on their heights.  Each of the six victims testified that one of the men was taller than the other two men.  The victims' descriptions of the tall man's height ranged from over six feet to six feet, three inches tall.

Three of the aggravated rapes—counts 1, 4, and, 6—were committed by the tall man.  In count 1, the State alleged that the Appellant penetrated M.J.'s vagina with his penis in the game room on the papasan chair.  M.J. testified that the perpetrator was taller than the man that raped her in the bedroom.  Though she did not specify whether he was taller than the third man, the majority of the victims did not notice any difference in the heights of the two shorter men.  The jury thus could have reasonably inferred that the tall man committed this rape.  In count 4, the State alleged that the Appellant penetrated L.R.'s vagina with his penis in the bedroom.  L.R. testified that the perpetrator was the tall man.  In count 6, the State alleged that the Appellant penetrated S.H.'s vagina with his penis in the game room.  S.H. testified that the perpetrator was the tall man.

The jury could have reasonably inferred that the Appellant was the tall man.  The presence of the Appellant's sperm on the papasan chair in the game room, along with his own statement, shows that the Appellant was in the home and committed at least one of the rapes.  Though the Appellant claimed that he was the driver and only briefly entered the home, five of the victims testified that they only saw three men in the home.  Only K.S. testified to seeing a fourth man bring S.H. into the home, but S.H. and the other four victims consistently testified that one of the three men already in the home brought S.H. inside.  Therefore, the evidence supports an inference that only three men were in the home, and one of those men was the Appellant.  The evidence also supports an inference that the Appellant was the person victims described as the tall man.  Descriptions of the tall man's height ranged from over six feet to six feet, three inches tall.  The Appellant is six feet, one inch tall, and his sperm was found on the papasan chair where M.J. was raped by a taller man.  A rational jury thus could have identified the Appellant as the perpetrator of the aggravated rapes in counts 1, 4, and 6.

The remaining aggravated rapes—counts 2, 3, and 5—were committed by one of the shorter men. In count 2, the State alleged that the Appellant, or one for whom the Appellant was criminally responsible for, penetrated M.J.'s vagina with his penis in the bedroom. M.J. testified that the perpetrator was shorter than the man that committed the rape alleged in count 1. In counts 3 and 5, the State alleged that the Appellant, or one for whom the Appellant was criminally responsible for, penetrated both L.R.'s mouth and S.H.'s mouth with his penis in the bedroom. L.R. and S.H. testified that the perpetrator was one of the shorter men.

Though the Appellant did not commit these aggravated rapes by his own conduct, a rational jury could have found that the Appellant intended to assist the shorter man. Despite the Appellant's contention that he only intended to assist in theft, the evidence viewed in the light most favorable to the State shows that all three men shared in a plan to rape the women. Shortly after entering the home, the men ordered L.R., M.J., and S.H. to remove their clothes. K.S. testified that each of the three men were shouting, "Rob, rape, murder is what we do." And the use of condoms shows that the men either brought condoms with them to the home invasion, or found condoms in the home and shared them amongst themselves. Either way, it is evidence of a shared intent to assist in the commission of the rapes.

A rational jury could also have found that the Appellant aided the perpetrator. In counts 3 and 5, one of the men—which the jury could have reasonably inferred was the Appellant—brought M.J. to the bedroom for the shorter man when the shorter man requested a second woman. When the shorter man said he wanted the other woman instead, the man brought him S.H. Though the aid in count 2 is less overt, a rational jury could have found that the Appellant aided the shorter man. Each of the men, armed with guns, ordered the women to remove their clothing. The leader stayed in the living room with the male victims to ensure they could not interfere with the rapes. And K.S. testified that after the rapes, the men were saying to one another, "We're gonna have to kill these folks" to avoid being caught. The evidence is therefore sufficient to support each of the Appellant's aggravated rape convictions.

**B. Aggravated Robbery**. The Appellant also challenges the proof of his identity as the perpetrator of the five aggravated robberies. He contends that none of the victims identified him and he did not enter the home until after the robberies occurred.

Unlike the aggravated rapes, the victims did not identify which man took which items. But, as discussed in Section I.A., the Appellant was one of the three men in the home. Even if the Appellant did not physically take all of the items, the evidence is sufficient to establish that he is criminally responsible for the aggravated robberies. The three men had a shared plan to take drugs and money from the individuals in the home.

- 15 -

Each of the three men entered the home, pointed guns at the victims, and ordered them to get on the ground so the men could take their phones and other belongings. Each of the men repeatedly asked the victims where the marijuana was hidden. They ransacked the home, taking a television, Xbox, PlayStation 3, Wii, swords, jewelry, laptop, and puppy. The Appellant admitted to bringing the Xbox, PlayStation 3, and swords to his mother's house. Therefore, a rational jury could have found that the Appellant was criminally responsible for the aggravated robberies.

Though the Appellant claims he did not enter the home until after the robberies, the jury was free to discredit his statements. Even in the Appellant's version of events, however, the Appellant agreed to drive the men to the home for payment, knowing that they planned to take drugs and money, and knowing that at least one of them was armed. He aided the men by driving them, serving as a lookout, and notifying them when they needed to leave. The Appellant is therefore not entitled to relief.

**C. Aggravated Assault**. The Appellant challenges the proof of his identity as the perpetrator of the three aggravated assaults, again emphasizing that none of the victims identified him.

The State alleged that the Appellant, armed with a gun, ordered L.R., M.J., and S.H. to undress, causing them to fear imminent bodily injury. The victims did not specify which of the three armed men was the perpetrator. But a rational jury could have found that it was the Appellant, or a person for whose conduct he was criminally responsible. Even if the Appellant did not order the women to undress, he intended to assist the commission of the offense and provided aid. As discussed in Section I.A., the evidence viewed in the light most favorable to the State shows that all three men shared in a plan to rape the women. Ordering the women to remove their clothes was part of this plan. And each of the men was armed and monitoring the women to ensure they removed their clothes, or monitoring the men to ensure they did not interfere. Accordingly, the evidence is sufficient to support the Appellant's convictions.

**D. Facilitation of Aggravated Assault**. The Appellant argues that there is insufficient evidence to establish that he was criminally responsible for the facilitation of the aggravated assaults. Specifically, he argues that he did not provide substantial assistance to the perpetrator because there is no evidence that he was in the home when the offenses occurred.

The jury acquitted the Appellant of the three counts of aggravated assault against K.S., S.R., and M.G. and convicted him of the lesser included offense of facilitation of aggravated assaults. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required

- 16 -

for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).

We first note a discrepancy between the theory of the offense presented in the indictment and the theory argued at trial. In counts 16, 17, and 18 of the indictment, the State alleged that the Appellant used or displayed a deadly weapon, causing K.S., S.R., and M.G. to reasonably fear imminent bodily injury. See Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). Though the jury was only instructed on aggravated assault based on reasonable fear of imminent bodily injury, the State argued at trial that the Appellant committed aggravated assault based on actual serious bodily injury. See id. § 39-13-102(a)(1)(A)(i). The State alleged that the Appellant shot both K.S. and M.G. in the hand, and struck S.R. in the head. Neither party addresses this discrepancy.

Regardless of this discrepancy, the evidence is sufficient to support the Appellant's conviction under either theory. The victims testified that the shorter man, who appeared to be in charge and had a gun, held K.S., S.R., and M.G. in the living room. When they insisted there were no drugs in the home, the shorter man shot both K.S. and M.G. in the hand and hit S.R. with a pistol six times. A rational jury could have found that the Appellant facilitated the shorter man's aggravated assault, whether that assault was based on the fear of imminent bodily injury or the actual serious bodily injury. First, the evidence, viewed in the light most favorable to the State, shows that the Appellant knew that the shorter man intended to commit aggravated assault. The Appellant indicated in his statement that he knew the leader was armed and intended to steal drugs and money from the victims. The jury could reasonably have inferred that the Appellant also knew that the man would shoot the victims if his threats were unsuccessful. Second, the evidence shows that the Appellant provided substantial assistance to the shorter man. The Appellant monitored the remaining victims to ensure they could not interfere with the assaults. Even in the Appellant's version of events, he drove the shorter man to the home, warned him when they needed to leave, and drove him away after the offense. Accordingly, the evidence is sufficient to support the Appellant's convictions for facilitation of aggravated assault.

**E. Aggravated Kidnapping**. The Appellant also challenges the proof of his identity as the perpetrator of the three aggravated kidnappings.

Two of the aggravated kidnappings—counts 20 and 21—were committed by one of the shorter men. In count 20, the State alleged that the Appellant removed L.R. from the living room and took her to the game room where an armed man demanded oral sex. L.R. testified that the perpetrator was one of the shorter men. A rational jury, however, could have found that the Appellant was criminally responsible for this aggravated kidnapping for the reasons discussed in Section I.A., including the shared plan to rape the women and

- 17 -

the Appellant's participation in ordering the women to undress. In count 21, the State alleged that the Appellant forced S.H. to enter the home while holding a gun to the back of her head. S.H. testified that the perpetrator was one of the shorter men. Kidnapping a person to prevent that person from calling the police and thwarting the planned robbery, however, was a natural and probable consequence of the aggravated robberies for which the Appellant was criminally responsible. Therefore, a rational jury could have found the Appellant criminally responsible for the shorter man's conduct.

The victims did not testify which of the three men committed the third aggravated kidnapping. In count 19, the State alleged that the Appellant, while armed with a gun, removed M.J. from the living room and took her to the bedroom where L.R. was being held. L.R. testified that she was in the bedroom with one of the shorter men, and the shorter man requested a second woman. One of the other men brought M.J. to the bedroom, which led to the rapes alleged in counts 3 and 5. As discussed in Section I.A., the jury could have reasonably inferred that the man that took M.J. to the bedroom was the Appellant. Accordingly, the evidence is sufficient to support each of the Appellant's aggravated kidnapping convictions.

F. **Aggravated Burglary**. The Appellant argues that there is insufficient evidence to establish that he intended to commit a felony, theft, or assault when he entered the home. The Appellant points to his testimony that he only entered the home to warn the men that the police had driven by.

The evidence is sufficient to support the Appellant's aggravated burglary conviction. As convicted in this case, aggravated burglary occurs when a person, "without the effective consent of the property owner" enters a habitation "not open to the public, with intent to commit a felony, theft, or assault." Tenn. Code Ann. § 39-14-403(a) (current version at § 39-13-1003), § 39-14-402(a)(1) (current version at § 39-13-1002). The evidence established that the Appellant was one of the three men that initially entered the home to take drugs and money. The Appellant admitted to police that he raped one of the women while inside the home, but contends that when he entered the home he only intended to warn the others that the police drove by. The jury, however, was free to discredit his statements. Accordingly, the Appellant is not entitled to relief.

G. **Employing a Firearm During the Commission of Dangerous Felony**. The Appellant challenges the proof of his identity as the perpetrator of employing a firearm during the commission of a dangerous felony. He contends that "three men came into the house with guns, but they were not identified." As discussed in Section I.A., however, the evidence shows that the Appellant was one of the three men in the home. The victims testified that the three men each had a gun during the commission of the aggravated

burglary. The evidence is therefore sufficient to show that the Appellant was the perpetrator, and he is not entitled to relief.

**II. Double Jeopardy**. The Appellant, although he frames it as a sufficiency of the evidence issue, argues that his convictions for aggravated assault and facilitation of aggravated assault violate the double jeopardy clause. He claims that these offenses are lesser included offenses of the aggravated robberies, for which he was also convicted. The State responds, and we agree, that the Appellant has waived this claim by raising it for the first time on appeal. To preserve a double jeopardy issue, a defendant must raise it in his motion for new trial and appellate brief. State v. Harbison, 539 S.W.3d 149, 164 (Tenn. 2018). Because the Appellant failed to raise this issue in his motion for new trial, the issue is waived, and he is not entitled to relief.

**III. Consecutive Sentencing**. The Appellant argues that the trial court erred in ordering partial consecutive sentences. He contends that his sentence is excessive because "other than the one instance of committing oral rape, the [Appellant] was sitting in the car when all of the other offenses were being committed[.]" The State responds, and we agree, that the trial court did not abuse its discretion in imposing partial consecutive sentences.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). When a defendant is convicted of more than one offense, the trial court may order the sentences to run consecutively if the court finds, by a preponderance of the evidence, that the defendant fits into at least one of the enumerated categories. Tenn. Code Ann. § 40-35-115(b). In this case, the trial court imposed consecutive sentencing based on the its finding that the Appellant was a dangerous offender whose behavior indicated no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See id. § 40-35-115(b)(4). Because the dangerous offender classification is "the most subjective to apply," the trial court must make two additional findings before ordering consecutive sentences based on this classification. Pollard, 432 S.W.3d at 863 (citing State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). The trial court must find that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

The trial court did not abuse its discretion by imposing partial consecutive sentences in this case. The court found that the Appellant was a dangerous offender whose behavior indicated no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). The court also found that the aggregate sentence was reasonably related to the severity of the offenses and necessary in order to protect the public from further criminal acts. The court noted that the

offense was "extremely horrifying and aggravating" and the Appellant "basically enslaved and tortured people."  The Appellant contends that his sentence is excessive because he only committed one rape.  But the jury convicted him of six, and the trial court acted within its discretion in ordering that the six aggravated rape sentences be served consecutively based on the dangerous offender classification.  Accordingly, the Appellant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we conclude that the evidence is sufficient to support the Appellant's convictions, and the trial court did not abuse its discretion in imposing partial consecutive sentences.  Accordingly, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE